# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MIKEL UNCAPHER**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 02:13-cv-00886 |
| | ) | |
| **CAROLYN W. COLVIN**, | ) | |
| ACTING COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER OF COURT

April 1, 2014

### I. Introduction

Plaintiff, Mikel Uncapher, brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c), for judicial review of the final determination of the Commissioner of Social Security ("Commissioner"), which denied his application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 401-403, 1381-1383(f). This matter comes before the Court on the parties' cross-motions for summary judgment. (ECF Nos. 8, 12). The Record has been developed at the administrative level. (ECF No. 6). The motions have been fully briefed and are ripe for disposition. (ECF Nos. 9, 13). For the following reasons, the Commissioner's Motion will be DENIED, and Plaintiff's Motion will be GRANTED in part and DENIED in part.

### II. Background

#### A. Procedural History

Plaintiff filed applications for DIB and SSI on May 26, 2010, alleging disability as of

May 1, 2010, due to hepatitis C. (R. 134-45, 157). The claims were initially denied on August 3, 2010. (R. 58-66).

Thereafter, Plaintiff requested a hearing, which was held on July 7, 2011, before Administrative Law Judge Barbara Artuso ("ALJ"). (R. 11). Plaintiff was represented by counsel and testified at the hearing. (R. 11). An impartial vocational expert ("VE"), Irene Montgomery, and Plaintiff's mother, Donna Uncapher, also testified. (R. 46, 50). A second VE, Michael Schmidt, was questioned through interrogatories submitted by the ALJ on October 24, 2011, and by Plaintiff's counsel on January 27, 2012. (R. 183-92)

On April 26, 2012, the ALJ issued a decision, which denied Plaintiff benefits. (R. 22). The ALJ's decision became the final decision of the Commissioner on May 8, 2013, when the Appeals Council denied Plaintiff's request for review. (R. 1-5).

Plaintiff filed suit in this Court on June 25, 2013, seeking judicial review of the ALJ's decision. (ECF No. 3). The Commissioner filed an Answer on August 30, 2013. (ECF No. 5). Cross-motions for summary judgment followed. (ECF Nos. 8, 11).

**B.     Facts**

Plaintiff was born January 1, 1984. (R. 153). He is a high school graduate with an Associate's Degree in culinary arts and food service and past relevant work experience as a fast-food worker and packer. (R. 157, 158, 317). However, he has not engaged in substantial gainful activity since his alleged disability onset date of May 1, 2010. (R. 13).

**1.     Medical Evidence**

Plaintiff presented to Western Family Medicine Associates on April 30, 2010, with complaints of abdominal pain and was examined by a physician's assistant, Erin M. Aganad, PA-C. (R. 216). Plaintiff reported that his pain had been occurring persistently for two weeks and

got worse with standing. (R. 216). He also reported having experienced fever, nausea, vomiting, and weight loss. (R. 216). During the course of the examination, Plaintiff admitted to using drugs for 10 years; he first used pain medications but then transitioned to heroin, which he claimed to have stopped using about two weeks prior to his appointment. (R. 216). Plaintiff also indicated that he had injected heroin after someone whom he knew had hepatitis. (R. 216). At the end of the examination, the physician's assistant told Plaintiff that he would benefit from suboxone or methadone treatment for his drug abuse and suggested that he go to the emergency room for a workup, as he was at high risk for contracting hepatitis and HIV. (R. 217). Blood work ordered by Plaintiff's physician, Kevin M. Wong, M.D., after the examination revealed elevated ALT/AST levels (10 times the normal limits). (R. 221). Moreover, testing for hepatitis C came back positive. (R. 22). On May 3, 2010, Viharika Bakshi, M.D., from Western Family Medicine, signed a Pennsylvania Department of Welfare Employability Assessment Form on Plaintiff's behalf, stating that he would be temporarily disabled from May 2010 until November 2010 due to abdominal pain.[1] (R. 202).

Plaintiff began receiving methadone maintenance therapy at Medtech Rehabilitation LLC on May 12, 2010. (R. 297). The facility provided Plaintiff with daily doses of methadone and also provided 2.5 hours of monthly counseling. (R. 297).

Plaintiff was referred to Jaideep Behari, M.D., a specialist at the UPMC Center for Liver Diseases in Pittsburgh, Pennsylvania, for treatment of his hepatitis. (R. 221). Dr. Behari first examined Plaintiff on June 3, 2010. (R. 221). Plaintiff's major complaint was "profound fatigue." (R. 221). According to his notes, Dr. Behari suspected that Plaintiff had acute hepatitis C and ordered additional blood work to confirm his impression. (R. 222-23). Dr. Behari also

---

1. It is not clear whether Dr. Bakshi actually examined Plaintiff before completing the form. (R. 202). It appears more likely that the form was completed by Ms. Aganad, the physician's assistant, as her name appears before Dr. Bakshi's on the form. (R. 202).

advised Plaintiff that he would need to completely abstain from drugs and alcohol before he could begin receiving hepatitis treatment. (R. 223).

Plaintiff returned to Dr. Behari's office for a follow-up on July 29, 2010. (R. 254). Dr. Behari noted that the results of the blood work confirmed his initial diagnosis. (R. 254). A CT scan from May 2010 did not show cirrhotic liver or any other evidence of portal hypertension, however, and Plaintiff's chronic disease workup was otherwise unremarkable. (R. 254). Dr. Behari also noted that Plaintiff had abstained from using heroin since May 2010 and was still undergoing methadone maintenance therapy (40 mg. daily). (R. 254). Because Plaintiff had only been off drugs for a very short period of time, however, Dr. Behari recommended that he continue to defer treatment for a few more months. (R. 255). Dr. Behari scheduled a follow-up in four months, when he planned to discuss the possibility of starting treatment. (R. 255).

The next day, Gail Sekas, M.D., reviewed Plaintiff's file and completed a physical RFC assessment. (R. 237-43). Dr. Sekas opined that Plaintiff could lift/carry 20 pounds occasionally and 10 pounds frequently; stand/walk for a total of about six hours in an eight-hour workday; and sit for a total of six hours in an eight-hour workday. (R. 238). However, no postural, manipulative, visual, communicative, or environmental limitations were reported. (R. 241). Additionally, although Plaintiff's daily activities were not "significantly limited in relationship to the alleged symptoms," Dr. Sekas noted that "[Plaintiff] continues to have fatigue which impacts on his ability to perform work-related activities." (R. 242).

Plaintiff had a follow-up appointment with Western Family Medicine on October 19, 2010. (R. 264). He reported feeling well with only minor complaints: continued pain in his liver area with nausea and vomiting in the morning, trouble sleeping, and skin lesions. (R. 264, 278). The physician's assistant also noted that Plaintiff had discovered a lump in his right testical that

caused him occasional pain; it was diagnosed as a testicular mass. (R. 278). During the mental status exam, the physician's assistant noted that Plaintiff was alert and cooperative, with no signs of anxiousness. (R. 279).

On December 16, 2010, Plaintiff had a second follow-up with Dr. Behari. (R. 246). Plaintiff reported that he still experienced relatively mild abdominal pain. (R. 246). Dr. Behari noted that Plaintiff had a low viral load, which suggested that he would respond well to treatment. (R. 246). Furthermore, it was noted that Plaintiff's drug abuse had been in remission since August 2010.[2] (R. 246). At the end of the examination, Dr. Behari had a discussion with Plaintiff regarding treatment options, as Plaintiff had still not undergone any treatment for the virus. (R. 246). According to his notes, Dr. Behari told Plaintiff that he could begin receiving treatment immediately with the currently approved therapy of pegylated interferon and ribavirin or delay treatment until 2011 when a new drug regimen was likely to be approved. (R. 246). Plaintiff opted for the latter course of action, and Dr. Behari concurred, noting that "given his young age and low suspicion for cirrhosis or advanced liver disease, I think that it would be reasonable to wait a few months before initiating therapy." (R. 247).

On January 11, 2011, Plaintiff was examined by Rupam Sharan at Westmoreland Gastroenterology Associates for his continued complaints of abdominal pain. (R. 283). Noting that Plaintiff had experienced constipation since beginning methadone treatment in May 2010, Dr. Sharan's diagnosed Plaintiff with constipation-induced abdominal pain and bloating. (R. 283-84). To alleviate these symptomss, Dr. Sharan prescribed Plaintiff with MiraLax. (R. 284).

---

2.    It is revealed elsewhere in the Record that Plaintiff reported to Lindsey Groves, Psy.D, that he relapsed in August 2010. (R. 304). According to the mental health questionnaire completed by Dr. Groves during her clinical interview, Plaintiff was in a car accident in August and used the money he received as a result of the accident to purchase crack cocaine. (R. 304). This statement, however, is contradicted by the May 2, 2011, report from Medtech Rehabilitation LLC, where Plaintiff received his methadone therapy treatment, which indicated that Plaintiff had not suffered any relapses since beginning treatment in May 2010. (R. 297).

5

He also started Plaintiff on Dexilant to manage his worsening gastroesophageal reflux disease with dysphagia (*i.e.*, trouble swallowing). (R. 284).

On June 24, 2011, Lindsey Groves, Psy.D., of Kreinbrook Psychological Services, interviewed Plaintiff and completed a mental impairment questionnaire. (R. 302). She diagnosed Plaintiff with opioid dependence, in early full remission, and generalized anxiety disorder. (R. 303). While Plaintiff was not currently undergoing mental health treatment, Dr. Groves noted that he had attended individual therapy for depression for eight sessions in 2006 and had also attended a two-month outpatient program "about two years ago." (R. 304). Dr. Groves' prognosis was guarded because of Plaintiff's chronic history of drug use, but she noted that he had been doing better in recent months. (R. 304). Nevertheless, she opined that Plaintiff met two of the listed impairments set forth in 20 C.F.R. Part 404, Subpart P, App'x 1: anxiety-related disorder and substance-addiction disorder. (R. 305). She also opined that Plaintiff would have a 70 percent permanent disability and that he could not engage in employment on a regular, sustained, competitive and productive basis at the time. (R. 305).

In the mental impairment questionnaire, Dr. Groves assessed Plaintiff with a current Global Assessment of Functioning ("GAF") score of 58.[3] (R. 305). She also checked the boxes next to the following symptoms: poor memory, appetite disturbance with weight change (she noted in the margin that Plaintiff had gained 20 pounds), sleep disturbance, mood disturbance, substance dependence, difficulty thinking and concentrating, social withdrawal/isolation, decreased energy, persistent irrational fears, and generalized persistent anxiety. (R. 306). In

---

3. The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 51 to 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning." *Id.*

addition, it was noted that Plaintiff felt anxiety in any type of group setting or around other people and that he worried a good bit. (R. 306). In view of those symptoms, Dr. Groves opined that Plaintiff's impairments would cause him to be absent from work approximately twice a month. (R. 308).

Furthermore, in the "Rating of Functional Limitations" section of the questionnaire, Dr. Groves opined that Plaintiff had moderate restrictions in daily living, marked difficulties in maintaining social functioning, and marked difficulties in maintaining concentration, persistence and pace. (R. 309). Furthermore, she found that Plaintiff would experience four or more repeated episodes of decompensation, each of an extended duration. (R. 309).

However, when asked to describe Plaintiff ability to perform work-related mental activities on a day-to-day basis, Dr. Groves indicated that Plaintiff had a good ability to follow work rules and function independently and a fair ability to relate to co-workers, deal with the public, use judgment, interact with supervisors, deal with work stresses, and maintain attention/concentration. (R. 311). When prompted to substantiate her findings, Dr. Groves explained that Plaintiff's history of substance abuse impacted his ability to get along with others but that once he got to know people, he was able to get along better. (R. 311). In the final two sections of the questionnaire, Dr. Groves opined that Plaintiff had a fair ability to understand, remember, and carry out complex job instructions; understand, remember, and carry out detailed, but not complex, job instructions; behave in an emotionally stable manner; and relate predictably in social situations. (R. 312). She also noted that Plaintiff had a good ability to understand, remember, and carry out simple job instructions; maintain his personal appearance; and demonstrate reliability. (R. 312).

On July 29, 2011, Dennis W. Kreinbrook, Ph.D., performed a consultative examination.

(R. 316). According to Dr. Kreinbrook, Plaintiff's psychomotor activity was within normal limits. (R. 317). Additionally, although Plaintiff was observed as being somewhat quiet and soft-spoken, with a depressed mood and dull affect, his thoughts were goal-directed and organized. (R. 317). He reported experiencing hallucinations and suicidal ideation in the past but said that he was not experiencing such thoughts at the time of the exam. (R. 317). Dr. Kreinbrook diagnosed Plaintiff with major depressive disorder (single episode, moderate intensity) and opioid dependence in remission with sustained methadone treatment. (R. 318). Moreover, he opined that Plaintiff had slight restrictions in understanding, remembering, and carrying out short, simple instructions, and interacting appropriately with the public. (R. 320). He also found that Plaintiff had moderate restrictions in understanding, remembering, and carrying out detailed instructions; making judgments on simple, work-related decisions; interacting appropriately with supervisors and co-workers; responding appropriately to work pressures in a usual work setting; and responding appropriately to changes in a routine work setting. (R. 320). Dr. Kreinbrook attributed Plaintiff's restrictions to his depressed mood, social anxiety, panic, and agoraphobia. (R. 320). Furthermore, he determined that after Plaintiff's methadone treatment, he could possibly work. (R. 321).

2.  **Administrative Hearing**

At his hearing, Plaintiff testified that he lives with his mother. (R. 33). When asked why he would have difficulty working, Plaintiff explained that he had pain in his side and vomits two or three times a day. (R. 35). Plaintiff also described feeling depressed and having low energy and fatigue, which causes him to take frequent naps. (R. 41). He testified that as of the date of the hearing, he had not started to receive treatment for his hepatitis C, though he was supposed to have done so sometime in 2011. (R. 36). He attributed the continued delay to scheduling

problems with Dr. Behari. (R. 36).

Describing his average day, Plaintiff testified that he wakes up around 8:00 a.m. or 9:00 a.m.. (R. 38). Some mornings, he has to vomit. (R. 38). After waking up, he goes to the Medtech clinic to receive his daily dose of methadone. (R. 38). Afterwards, Plaintiff returns home, sits on the couch, watches television, and then sleeps for about an hour before taking a shower and getting ready for the day. (R. 38). He also sometimes plays PlayStation videogames, though he said that he often falls asleep while doing so. (R. 38). Additionally, he stated that he tries to help his mother with household activities like vacuuming, sweeping the floor, and cutting the grass, but it takes him a long time to cut the grass because he has to take frequent breaks. (R. 39). He also testified that cannot do laundry because it is too physical for him. (R. 39).

Plaintiff testified that he has a driver's license but does not like to drive because he once was involved in an accident after having an attack of pain while driving. (R. 38-39). In terms of social activities, Plaintiff testified that he does not go shopping, attend church or meetings of any kind, belong to any groups or organizations, or have any hobbies besides playing videogames, though he testified that he used to enjoy fishing and would like to take that hobby up again. (R. 39). He does not go out with friends or family. (R. 39). In fact, he explained that he does not have any friends and gets nervous around large groups of people. (R. 44).

Plaintiff's mother, Donna, testified that before Plaintiff was diagnosed with hepatitis C, he was very sickly. (R. 47). More recently, she noticed that he appears very sluggish, gets fatigued very easily, and sleeps a lot. (R. 48). Furthermore, Plaintiff does not want to socialize with others, his mother testified. (R. 48). She also explained that Plaintiff suffered depression as a teenager because he was picked on by other students at school. (R. 47).

At the conclusion of the hearing, the ALJ asked the vocational expert, Irene Montgomery,

whether jobs exist in the national economy for a hypothetical individual of the same age, education, and work experience as Plaintiff, who could perform a full range of light work that would require understanding, remembering, and carrying out only simple instructions and making few, if any, work-related decisions. (R. 51-52). In response, Montgomery testified that such an individual could perform the following jobs: laundry sorter or folder, racker in a bakery setting, and bagger. (R. 52). Montgomery testified that her response would not change if the hypothetical individual was required to avoid concentrated exposure to heat. (R. 52). However, when questioned whether the hypothetical individual could perform the identified positions if he had to avoid jobs requiring the preparation of food, Montgomery explained that he would not be able to perform the racker position, as it involved work in a bakery, but that the jobs of marker or ticketer would still be suitable for him. (R. 52-53). Upon questioning from Plaintiff's counsel, Montgomery testified that if an individual had difficulties with concentration that took him off task 10 percent of the time, his ability to perform full-time work would be compromised. (R. 53).

After the hearing, the ALJ obtained answers to interrogatories from vocational expert Michael Schmidt. (R. 183-86). The ALJ posed a hypothetical to Schmidt that was identical to the one posed to Montgomery, except that it limited Plaintiff to occasional interaction with the general public, co-workers, and supervisors. (R. 184). In response, Schmidt identified the positions of garment sorter, housekeeping cleaner, and folder as ones that the hypothetical individual could perform despite his impairments. (R. 185). Upon questioning from Plaintiff's counsel, who asked whether jobs would still exist in the national economy if the hypothetical individual would be off task 10 percent of the time, Schmidt responded "yes." (R. 192).

## III. Legal Analysis

### A. Standard of Review

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. § 423(d)(1)(A); *Brewster v. Heckler*, 786 F.2d 581, 583 (3d Cir. 1986). The Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the Act's requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent her from performing his past relevant work; and (5) if the claimant is incapable of performing her past relevant work, whether she can perform any other work which exists in the national economy. 20 C.F.R. § 404.1520(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24–25 (2003). If it is determined that the claimant cannot resume her previous employment, the burden shifts to the Commissioner to prove that, given claimant's mental or physical limitations, age, education, and work experience, she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)(3), 1383(c)(3)(4); *Schaudeck v.*

*Comm'r Soc. Sec. Admin.*, 181 F.3d 429, 431 (3d Cir. 1999). However, the district court's review of the Commissioner's findings of fact is limited to determining whether substantial evidence existed in the record to support the Commissioner's decision. *Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002). Substantial evidence means "more than a mere scintilla." *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, (1971)). There must be "such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Id.* If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390.

When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision or re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196–97 (1947). Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Med. Cntr. v. Heckler*, 806 F.2d 1185, 90–91 (3d Cir. 1986).

**B.     The ALJ's Decision**

At step 1 of the sequential evaluation, the ALJ found that Plaintiff has not engaged in substantial gainful activity since his alleged onset date. (R. 13). At step 2, the ALJ determined that Plaintiff has the following severe impairments: hepatitis C virus, major depressive disorder, generalized anxiety disorder, and a history of opioid dependence. (R. 13). Nevertheless, the ALJ found that none of Plaintiff's impairments met or equaled the criteria of any of the listed

impairments in 20 C.F.R., Pt. 404, Subpt. P, App'x 1. (R. 14-16). Having made that determination, the ALJ proceeded to explain that Plaintiff maintained the ability to perform light work with the following limitations:

> he is limited to jobs requiring understanding, remembering, and carrying out only simple instructions, making few, if any, work-related decisions, is limited to only occasional interaction with the general public, co-workers, and supervisors, must avoid concentrated exposure to heat, and must avoid work involving the preparation and/or service of food or food products.

(R. 23). Based on VE Schmidt's responses to the ALJ's interrogatories, the ALJ concluded that given Plaintiff's age, education, work experience, and residual functioning capacity ("RFC"), there are a significant number of jobs in the national economy that he can perform. (R. 21). Plaintiff was not, therefore, found to be disabled under the Act. (R. 22).

### C. Discussion

As set forth in the Act and applicable case law, this Court may not undertake a *de novo* review of the ALJ's decision or re-weigh the evidence of record. *Monsour Med. Cntr.*, 806 F.2d at 1190. Rather, the Court must simply review the findings and conclusions of the ALJ to determine whether they are supported by substantial evidence. 42 U.S.C. 405(g); *Schaudeck*, 181 F.3d at 431.

Plaintiff raises a battery of objections to the ALJ's decision. *See* Pl.'s Br. in Supp. of Mot. for Summ. J at 3-4 (ECF No. 9). The Commissioner counters that the ALJ's decision was supported by substantial evidence. *See* Def.'s Br. in Supp. of Mot. for Summ. J. at 9-14 (ECF No. 13). Although most of Plaintiff's arguments are baseless,[4] a few of his interrelated

---

4. Included in the category of spurious arguments is Plaintiff's claim regarding the ALJ's treatment of the "opinions and findings" of Drs. Behari and Bakshi. It is true that an ALJ must "consider[] all the evidence, both for and against the claim, and provide some explanation of why s/he has rejected probative evidence which would have suggested a contrary disposition." *Cotter v. Harris*, 650 F.2d 481, 482 (3d Cir. 1981). The problem with Plaintiff's argument, however, is that nothing in the Record from either Dr. Behari or Dr. Bakshi (who does not appear to have ever actually *examined* Plaintiff) "would have suggested a contrary disposition." Neither of them ever opined that Plaintiff could not work, and the treatment notes from Plaintiff's visits with Dr. Behari and Western Family

arguments merit further discussion and necessitate a remand to the ALJ for further proceedings. Specifically, the Court agrees with Plaintiff's argument that the ALJ committed reversible error by failing to properly evaluate his complaints of fatigue and discuss whether it affected his ability to work and in turn proposing an incomplete hypothetical to the VEs. The Court also concludes that the ALJ erred in failing to adequately address the testimony of Plaintiff's mother, which supported his own testimony regarding his complaints of fatigue.

As to the first point, an ALJ must include all credibly established limitations on a claimant's ability to work in her RFC assessment and the hypothetical question posed to the VE. *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005). Even if a limitation is not supported by objective medical evidence, it may still be deemed to be credible. *Id.* In that respect, when making an RFC determination, the ALJ must give serious consideration to claimant's subjective complaints of impairments such as fatigue, regardless of whether they are fully supported by objective medical evidence in the record. *Gupta v. Astrue*, No. 09-1055, 2010 WL 2835719, at *12 (W.D. Pa. July 16, 2010) (citation omitted). Where a subjective impairment could reasonably be caused by a claimant's medical condition, the ALJ must evaluate the intensity and

---

Medicine did not document any limitations in Plaintiff's ability to work, aside from the Employability assessment form, which was "weak evidence" of Plaintiff's impairment. *See Griffin v. Comm'r of Soc. Sec.*, 305 F. App'x 886, 891 (3d Cir. 2009) (citing *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993)). Also included in this category is Plaintiff's argument that the ALJ improperly rejected Dr. Groves' finding that Plaintiff had marked limitations in two areas of functioning. Contrary to Plaintiff's argument, the ALJ's decision to reject Dr. Groves' opinions was supported by substantial evidence. Dr. Groves was the only medical source to have opined that Plaintiff had marked limitations in social functioning and maintaining concentration, persistence and pace. All of the other medical evidence in the Record pointed to only marked limitations in those areas. Moreover, Dr. Groves' findings were internally inconsistent. As the ALJ observed, Dr. Groves actually remarked that despite his impairments Plaintiff had a fair ability to relate to co-workers, deal with the public, interact with supervisors, and deal with work stresses. Yet she offered no explanation for how those findings squared with her assessment of marked limitations in social functioning. Likewise, she opined that Plaintiff had a fair ability to maintain attention and concentration; understand, remember and carry out complex job instructions; and understand, remember and carry out simple job instructions— all of which belies the ALJ's finding of marked attention-and-concentration-related restrictions. Finally, although Plaintiff is correct that the ALJ did not expressly explain how much weight she was assigning to Dr. Kreinbrook's opinion, as the regulations require, the Court finds the error harmless. Since Dr. Kreinbrook's opinions were fully consistent with the ALJ's RFC, the ALJ did not err in making a specific finding as to how much weight he was according them.

persistence of the symptom and its potential work-preclusive effects. *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999) (emphasis added). If she wishes to reject a claimant's subjective complaints, the ALJ must then point to contradictory evidence from the medical record and sufficiently explain her rationale. *Williams v. Sullivan*, 970 F.2d 1178, 1184–85 (3d Cir. 1992); *Burnett*, 220 F.3d at 119–20.

In this case, there should have been little question to the ALJ that Plaintiff's hepatitis C could have reasonably been expected to cause the persistent fatigue of which Plaintiff complained. *See, e.g.*, *Meek v. Astrue*, No. 10–0348, 2010 WL 4629903, at *4 (D. Ariz. Nov. 8, 2010) (Plaintiff "established that he had at least one "impairment"—hepatitis C—that causes fatigue."). Nevertheless, the ALJ never "specifically discussed the Plaintiff's alleged symptoms of severely limiting fatigue," which were documented in the treatment notes from Dr. Behari and the RFC assessment completed by Dr. Sekas, "contrasted [those symptoms] with the underlying medical record and with Plaintiff's own reports of regular activities, and found the fatigue did not impair Plaintiff's ability to work," *Gupta*, 2010 WL 2835719, at *13. Although the ALJ did conclude generally that Plaintiff's testimony about his "impairments"—notably, the ALJ did not specify *which* impairments—were not fully credible since she found they were "not consistent with his activities of daily living, his medical history, his medical regimen, his work and earnings history, and the other evidence in the record,"[5] (R. 20), without having expressly considered the

---

5.    In coming to that conclusion, the ALJ impermissibly overlooked pieces of evidence that contradicted her opinion and highlighted evidence that supported her position. *See Kklenar v. Barnhart*, 195 F. Supp. 2d 696, 703 n.6 (W.D. Pa. 2002) (An ALJ "cannot 'pick and choose' only the evidence that supports his position.") (Quotation omitted). In particular, while the ALJ did limitedly discuss Plaintiff's self-reported daily activities, (R. 18), she made no mention of the fact that Plaintiff had also testified about the need to take naps throughout the day and how his fatigue made it more difficult for him to engage in activities like mowing the grass that he could once do with greater ease.  Moreover, to the extent that the ALJ discredited Plaintiff's credibility regarding his alleged fatigue because he had yet to begin hepatitis C treatment, (R. 18), this decision was erroneous.  Plaintiff's treatment was first delayed because he was advised that he could not begin treatment until he was completely drug-free and further delayed once he and Dr. Behari determined that he would wait to undergo treatment until a new drug was approved

15

effects of Plaintiff's fatigue on his ability to work, the ALJ's RFC analysis was incomplete. In turn, the vocational experts' responses to the hypothetical questions posed by the ALJ did not constitute substantial evidence. *See Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987) ("A hypothetical question must reflect all of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence."); *Rutherford*, 399 F.3d at 554 (ALJ's hypothetical question "must accurately convey to the vocational expert all of a claimant's credibly established limitations."). Therefore, this case must be remanded to the ALJ for further proceedings. On remand, the ALJ must specifically address the effects of Plaintiff's fatigue on his ability to work. If necessary (*i.e.*, if it is determined that Plaintiff's complaints of fatigue are credible), the ALJ must then accommodate fatigue-related limitations in her RFC assessment and pose a new hypothetical question to a vocational expert.

Plaintiff is also correct that the ALJ failed to sufficiently address his mother's testimony. Our appellate court has held that an ALJ must consider the testimony of an additional witness presented to bolster the claimant's testimony and make a specific determination as to the credibility of that witness' testimony before deciding to reject it. *See Burnett*, 220 F.3d at 122 (citing *Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983)). *See also* SDT 06-04P, 2006 WL 2329939 (Aug. 9, 2006) (In rendering a decision, the ALJ must "consider evidence provided by other 'non-medical sources' such as spouses, other relatives, friends, employers, and neighbors."). As the Court of Appeals explained in *Van Horn*, "While the ALJ is empowered to evaluate the credibility of witnesses, we would expect [her] at least to state that [she] found a witness not credible before wholly disregarding [the witness'] testimony." *Van Horn*, 717 F.2d at

---

in 2011. Such evidence does not support a finding that Plaintiff avoided hepatitis C treatment in a way that undermines his credibility.

873 (remanding where ALJ failed to address non-medical opinion testimony).

The ALJ's decision in this case ran afoul of that principle, as the ALJ made no specific finding as to the credibility of Plaintiff's mother. In fact, the ALJ's decision makes only a passing reference to Donna Uncapher's testimony: "The claimant and the claimant's mother both testified that the claimant continues to experience limitations as a result of his alleged impairments." (R. 17). The ALJ proceeded to discredit Plaintiff's testimony for purportedly being inconsistent with "his activities of daily living, his medical history, his medication regimen, his work and earnings history, and the other evidence in the record." (R. 20). Yet before reaching that conclusion, the ALJ never considered Plaintiff's testimony in relation to his mother's testimony, which tended to corroborate Plaintiff's own claims about his difficulties with activities of daily living resulting from fatigue. As one example, Plaintiff's mother testified that "he's very sluggish, sleeps a lot, nods off a lot, and he's fatigued." (R. 48). She also testified that although Plaintiff does mow the grass, he has to take frequent breaks while doing so, and that he was "not able to do a lot right now." (R. 48). On remand, the ALJ must expressly address whether the testimony of Plaintiff's mother is consistent with the other evidence in the Record on the debilitating effects of his hepatitis C-related fatigue—including Plaintiff's own testimony—and if the ALJ chooses to reject such testimony, she must clearly set forth her reason(s) for doing so, so as to permit the Court to engage in meaningful judicial review of her decision.

## IV. Conclusion

Under the Social Security regulations, a federal district court, upon review of a decision of the Commissioner denying benefits, has three options. It may affirm the decision, reverse the decision and award benefits directly to a claimant, or remand the matter to the Commissioner for further consideration. 42 U.S.C. § 405(g) (sentence four). In light of an objective review of all of

the evidence in the Record, the Court finds that the ALJ failed to support her decision with substantial evidence and that the decision must be remanded to the ALJ for further consideration consistent with this Opinion. The Commissioner's decision in the present case may, however, ultimately be correct and nothing hereinabove stated should be taken to suggest that the Court has concluded otherwise.

For these reasons, Plaintiff's Motion for Summary Judgment will be **GRANTED** insofar as it requests a remand for further consideration in accordance with sentence four of 42 U.S.C. § 405(g); Defendant's Motion for Summary Judgment will be **DENIED**; and the decision of the ALJ will be **VACATED** and **REMANDED** for further consideration consistent with this Opinion. On remand, the ALJ is instructed to discuss the testimony of Plaintiff's mother and make a specific finding as to the credibility of that testimony. The ALJ is further instructed to properly evaluate Plaintiff's complaints of fatigue resulting from his hepatitis C and specifically determine whether (1) the complaints are credible, and (2) there is a need to incorporate this impairment into Plaintiff's RFC assessment and in a hypothetical question posed to a vocational expert. An appropriate Order follows.

McVerry, J.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MIKEL UNCAPHER**, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  02:13-cv-00886 |
| | ) |
| **CAROLYN W. COLVIN**, | ) |
| ACTING COMMISSIONER OF | ) |
| SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |

## ORDER OF COURT

**AND NOW**, this 1st day of April, 2014, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED,** and **DECREED** that:

1. Defendant's Motion for Summary Judgment is **DENIED**.

2. Plaintiff's Motion for Summary Judgment is **GRANTED** insofar as it requests remand to the Commissioner for further proceedings consistent with the foregoing Memorandum Opinion pursuant to the fourth sentence of 42 U.S.C. § 405(g); and **DENIED** insofar as it requests that benefits be awarded.

3. The Clerk will docket this case closed.

BY THE COURT:

s/ Terrence F. McVerry
United States District Judge

**cc:** H. Brian Peck, Esq.
**Email:** brian@crossroadslaw.com

Christy Wiegand, Esq.
**Email:** christy.wiegand@usdoj.gov